Richard M. PICINICH, Plaintiff,

v.

UNITED PARCEL SERVICE, Jim Grover, Brendan Canavan, Jeffrey Wilson and United Parcel Service of America, Inc., Defendants.

No. 5:01–CV–01868 (NPM).

United States District Court,
N.D. New York.

June 15, 2004.

---

486

Legal Services of Central New York, David Thomas Hutt, of Counsel, Syracuse, NY, for the Plaintiff.

Pitney, Hardin, Kipp & Szuch, Adin C. Goldberg, of Counsel, Morristown, NJ, for the Defendants.

### MEMORANDUM–DECISION and ORDER

MCCURN, Senior District Judge.

## I. INTRODUCTION

Plaintiff, Richard M. Picinich ("Picinich") brings this suit against United Parcel Service ("UPS"), United Parcel Service of America, Inc. ("UPS of America"), Jim Grover ("Grover"), Brendan Canavan ("Canavan"), and Jeffrey Wilson ("Wilson"), alleging violations of the Americans with Disabilities Act ("ADA") and New York Human Rights Law ("NYHRL").[1] Presently before the court is the defendants' motion for summary judgment dismissing the entire complaint. Also before the court is a motion for partial summary judgment by the plaintiff. Oral argument was heard regarding the pending motions on December 22, 2003 in Syracuse, New York. Decision was reserved.

---

**1.** Defendant Grover was the Human Resources Manager for the Upstate New York District from September 1998 through September 2000, and defendant Wilson held the same position in that District from October 2000 through June 2002. Defendant Canavan was the District Manager for the Upstate New York District from January 2000 through March 2003.

## II. BACKGROUND

Picinich began his employment with defendant UPS in 1976. From 1982 until 1991, he held various management level positions which required him to supervise operations at different UPS facilities, primarily in New Jersey. Picinich was promoted to Security Manager in June 1991, and UPS relocated him to its Upstate New York District ("Upstate N.Y. District"), where he continued as a Security Manager until June 1999. The Security Manager position required that Picinich work out of Syracuse, New York and complete security responsibilities in an area spanning from the New York–Canadian border to the north, Albany, New York to the east, and Binghamton, New York to the south.

On July 1, 1999, Picinich was reassigned to a new position, entitled District Damage Coordinator, in the Damage Recovery Group of the Upstate N.Y. District. In November 1999, Picinich was temporarily assigned to an operations management position in Utica, New York, entitled Preload Manager, and in December 1999, he was notified that the assignment was permanent. Picinich objected to this assignment for reasons unrelated to the present motions, and elected to challenge same through the "Employee Dispute Resolution" ("EDR") process at UPS. As the first step of EDR, Picinich met with Doye Lux, the District Manager at that time, and defendant Grover on January 7, 2000 to ask that he be placed back on his career path in the area of security. Picinich also requested a "peer review" hearing with a committee, which included two representatives selected by him and one selected by UPS. The hearing, held on March 2, 2000, resulted in a decision by the committee that Picinich's reassignment to the Preload Manager position was appropriate. *See* Aff. of Jonathan J. Harper, Oct. 8, 2003 at Ex. 3, Dkt. No. 40.

Prior to the hearing, on January 20, 2000, Picinich "called out" from work due to a back condition, for which he had been receiving medical treatment for approximately three weeks. *See* Pl.'s Ex. D, Dep. of Richard Picinich, Feb. 24, 2003 ("Picinich Dep. I") at 204:20–205:14, Dkt. No. 45.[2] A review of Picinich's deposition transcript indicates that he testified to experiencing back pain while at work in the early morning on January 20, 2000, that he called Dr. J. Christopher Stringer on the same day and was told not to go into work that evening, as his shift was to begin at approximately 9:00 p.m. on January 20, 2000 and end in the early morning of January 21, 2000.

On February 1, 2000, Picinich began short-term disability leave, which included continuation of his full salary,[3] after Dr. Jeffery Kahn, to whom he was referred by Dr. Stringer, notified UPS that Picinich could not return to work due to a back injury. Dr. Kahn issued a physician's note on January 21, 2000 which stated that Picinich was "temporarily totally disabled" until further notice.[4] *See* Harper Aff. at

**2.** Plaintiff submitted a copy of his medical records from office visits with Dr. J. Christopher Stringer wherein it is recorded that he sought treatment for lower back pain on December 30, 1999, January 14, 2000, January 18, 2000, and January 21, 2000.

**3.** Picinich testified that he was receiving his full salary payment while on short-term disability leave. However, he also testified that while on leave he was not receiving "stock or any of that type of compensation" which he apparently claims to have received while working. *See* Pl.'s Ex. E, Dep. of Richard M. Picinich, Mar. 17, 2003 ("Picinich Dep. II") at 67:4–18, Dkt. No. 45.

**4.** The Occupational Health Manager for the Upstate N.Y. District, Registered Nurse Robin Fey, received copies of Dr. Kahn's treatment notes regarding Picinich from January 2000 through approximately March 2001. *See* Pl.'s

Ex. 4, Dkt. No. 40. Dr. Kahn issued a report after Picinich's January 21, 2000 office visit, wherein he stated that "it is contraindicated for [Picinich] to perform the type of work that he does, given the fact that he has a subacute disc herniation, and with the minimum of two hours of sitting per day in traveling from Syracuse to Utica that is required for his job. I am going to provide him with an out of work note until further notice." Id. at Ex. 5. On March 10, 2000, Dr. Kahn diagnosed Picinich with "multilevel lumbar disc herniations with radiculopathy" and stated that the work restrictions in place at that time should not be modified. See Pl.'s Ex. 6, Dkt. No. 45.

On March 15, 2000, Picinich underwent an independent medical examination ("IME") at the request of CIGNA, the then administrator of disability benefits for UPS. Defendants contend that Dr. W. David Ferraraccio, the orthopedic surgeon who conducted the IME, concluded that Picinich "could return to the pre-load within certain medical restrictions." See Defs.' Statement of Material Facts at ¶ 29, Dkt. No. 38. In fact, as Picinich correctly notes, the IME report indicates that he "cannot return to his previous employment with the degree of lifting, bending, and stooping involved." Dr. Ferraraccio further stated in this report that "[i]f work were available where [Picinich's] lifting could be limited to no more than 10 to 12 pounds on an occasional basis where he did not have to bend, twist, stoop, push or pull repetitively, and where he had complete freedom to change position from sitting to standing at will, I would feel this to be satisfactory." See Harper Aff. at Ex. 6, Dkt. No. 40. Dr. Kahn informed CIGNA on March 27, 2000 that after review of Dr.

Ferraraccio's report, he agreed that Picinich could return to his previous job only if his work were modified appropriately and that he could not return to his previous job with the degree of lifting, bending and stooping involved. See Pl.'s Ex. 10, Dkt. No. 45. By letter dated March 31, 2000, CIGNA notified Picinich that it recommended immediate termination of his wage continuation benefits because, based on the reports of Drs. Ferraraccio and Kahn, UPS determined "that they are able to make reasonable accommodations in order for [Picinich] to successfully return to work." See Pl.'s Ex. 11, Dkt. No. 45.

On April 3, 2000, Dr. Kahn notified CIGNA that Picinich could return to work with the following restrictions: no bending or lifting below the waist, no more than 30 minutes of standing or walking, no lifting in excess of 10 pounds between waist and shoulder level, no kneeling, stooping, bending, climbing or twisting, and no driving more than 30 minutes. See Pl.'s Ex. 12, Dkt. No. 45. Dr. Kahn also stated that he expected the aforementioned restrictions would remain on a permanent basis, and that considering, among other factors, the driving distance between Picinich's home and the UPS location where he last worked, Picinich "could not return to his work activities" as Kahn understood them to be offered at that time. See id.

UPS requested a meeting with Picinich to discuss his return to work, and on April 7, 2000, Picinich met with four UPS representatives, including Registered Nurse Robin Fey, Occupational Health Manager for the Upstate N.Y. District, and defendant Grover, and reviewed his work restrictions. During that meeting, Picinich was told to work within his restrictions, and that a part time Preload Supervisor

Statement of Material Facts at ¶ 2, Dkt. No. 43; Defs.' Response to Pl.'s Statement of Material Facts at ¶ 2, Dkt. No. 50.

would be available to assist him. On April 10, 2000, Dr. Kahn issued a formal release for Picinich to return to work within the restrictions he outlined for CIGNA on April 3, 2000.

Picinich contends that he returned to work as the Preload Manager at the UPS facility in Utica in the evening of April 11, 2000 and worked "for three or so days" until Dr. Kahn removed him from work "because of the pain and condition [he] was in." *See* Aff. of Richard Picinich, Oct. 27, 2003 at ¶ 9, Dkt. No. 44; Pl.'s Ex. E, Dep. of Richard Picinich, Mar. 17, 2003 ("Picinich Dep. II") at 70:4–23, Dkt. No. 45. According to Picinich, when he arrived at work on the evening of April 11, 2000, he discovered that the part time Preload Supervisor, Scott Briggs, was in a knee brace because, according to Mr. Briggs, he underwent knee surgery. *See* Picinich Aff. at ¶ 9, Dkt. No. 44. Further, Picinich contends that during the three days of his return to work, Mr. Briggs was unable to assist Picinich with any physical activities and requested that Picinich train new employees, since, Mr. Briggs claimed, he was unable to do so due to his knee. Id. at ¶ 10. Also during this time, Picinich contends he "was forced to restrain a package sliding towards [him] to protect [himself] while on the operations floor, to twist and bend due to inadequate room, to maneuver on the operations floor, to be on [his] feet most of the day, and to train new employees." Id. at ¶ 11.[5] On April 14, 2000, Dr. Kahn removed Picinich from work "effective immediately," stating that he was to be considered "temporarily totally disabled

until further notice." *See* Harper Aff. at Ex. 9, Dkt. No. 40.

Picinich contends that in May 2000, he asked Robin Fey about returning to work, and in June 2000, he inquired with her about relocating to another district. *See* Pl.'s Ex. J, Dep. of Robin Fey, Feb. 26, 2003 at 138:17–139:5, 148:7–149:5, Dkt. No. 45. However, on June 15, 2000, Dr. Kahn diagnosed Picinich with "multilevel lumbar degenerative disc disease with bilateral L5 and left S1 radiculopathies" and concluded that, regarding work issues, he "would like to have [Picinich] perform an aggressive stabilization program for the next four weeks before considering any release to return to work at this time." Moreover, Dr. Kahn stated that "the violation of the guidelines for return to work parameters which occurred in April cannot occur again, and unless I receive some written assurance that such will not occur and a detailed job description which will be adhered to is provided, no return to work release will be provided, and [Picinich] will be considered permanently disabled." *See* Pl.'s Ex. 18, Dkt. No. 45.

Thereafter, on July 13, 2000, Picinich underwent a functional capacity exam ("FCE") at the request of CIGNA.[6] After the exam, Picinich was examined by Dr. Kahn, who later reported that Picinich suffered re-injury from the FCE and he could not predict the degree to which Picinich would recover or the time it would take. *See* Pl.'s Ex. 19, Dkt. No. 45; Harper Aff. at Ex. 10, Dkt. No. 40. On July 20, 2000,

---

**5.** Defendants do not cite any evidence in the record that would contradict Picinich's contentions regarding his return to work in April 2000. Instead, at the hearing regarding the present motions, defendants argued, without supporting evidence, that as a manager, Picinich "had a whole staff of people reporting to him that he could have directed in terms of performing any task that he was restricted by

Dr. Kahn from doing." *See* Tr., Dec. 22, 2003 at 37:18–21, Dkt. No. 57.

**6.** At her deposition, Robin Fey testified that she did not recall whether UPS had any input into the decision to require that Picinich undergo a FCE. *See* Pl.'s Ex. J, Fey Dep. at 163:19–164:15, Dkt. No. 45.

Dr. Kahn issued another report in which he stated that Picinich was to be considered "temporarily totally disabled from *any type of work activities*" at that time. *See* Harper Aff. at Ex. 11, Dkt. No. 40 (emphasis added).

The following month, August 2000, Picinich told Robin Fey that he wanted to be a productive employee at UPS. However, on August 15, 2000, Dr. Kahn issued a report which stated that Picinich was "temporarily totally disabled from employment." In a meeting between Picinich and defendants Grover and Canavan on September 25, 2000, Picinich indicated that he wished to return to work, requested a staff position, mentioned he was having back problems, and requested a reasonable accommodation. However, Dr. Kahn notified UPS, on November 3 and 28, 2000, that he continued to deem Picinich "temporarily totally disabled".

On January 5, 2001, Dr. Kahn released Picinich for work, with the following restrictions:

[1] No sitting, standing, driving or walking more than 25 minutes at a time.

[2] No bending, lifting, carrying, climbing, stooping, kneeling, twisting, or squatting on a permanent basis.

[3] He must be placed in a work environment where he has an adequate space and safe area to be able to perform prone extensions on an hourly basis or more frequent as needed.

[4] He must be afforded the opportunity to change positions every 25 minutes as described above.

Additionally, Dr. Kahn reported that Picinich needed to work, on a permanent basis, in a "sedentary position, with no physical handling activities of any type." Pl.'s Ex. 25, Dkt. No. 45. On January 12, 2001, in response to a request by Dave Matt, District Workforce Planning Manager at UPS[7], Dr. Kahn reported that, as of that date, Picinich was unable to perform all of the physical and mental functions of the Preload Manager position as reported by UPS. *See* Harper Aff. at Ex. 15, Dkt. No. 40. Dr. Kahn also reported that, regarding the Preload Manager position, Picinich was unable to perform the following functions: load or unload packages of up to 70 pounds, bend, stoop, crouch, crawl, climb, turn-pivot, lift and lower packages up to 70 pounds, assist in moving packages up to 150 pounds, or lift above shoulder or below waist to foot level. *See* id. Further, Dr. Kahn reported that Picinich could travel by car on a limited basis, to wit, 25 minutes at a time. *See* id. *See also* Pl.'s Ex. K, Kahn Dep. at 90:8–25, 113:9–16, Dkt. No. 45. On February 1, 2001, in response to another request from Dave Matt, Dr. Kahn reworded his aforementioned restrictions as capabilities as follows:

It is my opinion within a reasonable degree of medical certainty that [Picinich] can work in a full time sedentary position within the following parameters:

[1] He may alternate between sitting, standing and walking, with none of those activities performed more than 25 minutes at a time, prior to change in position, and may drive up to 25 minutes from his home to work place.

[2] He may utilize standard office equipment at his desk such a s a calculator, computer or telephone.

---

**7.** Ostensibly this request was made in accordance with "the UPS ADA procedure," which is described by defendants as a "ten-step interactive process to determine when a reasonable accommodation is required. This procedure involves various steps with input from both a District and Region in determining whether an individual is 'disabled' and, if so, what accommodation is appropriate." Defs.' Statement of Material Facts at ¶ 47, Dkt. No. 38, *citing* Harper Aff. at Ex. 16, Dkt. No. 40.

[3] He must be allowed to work in an environment where there is a safe area to allow him to perform exercises previously described at least on an hourly basis for a few minutes, or more frequently if necessary.

Harper Aff. at Ex. 18, Dkt. No. 40. Dr. Kahn concluded by stating that Picinich "may not perform any bending, lifting, carrying, climbing, stooping, kneeling, twisting or squatting at any time ... [and] may not perform any physical handling type activities, drive a vehicle other than his own vehicle to and from work, or climb any more than a few stairs to access his work space, with full restriction on repetitious stair climbing as an integral part of work activities." Id.

On January 19, 2001, Picinich asked Robin Fey if he could transfer to another district, to which she replied that she "did not know but [ ] would ask." See Pl.'s Ex. J, Fey Dep. at 198:5–17, Dkt. No. 45. On February 1, 2001, UPS employee Tom Wolfe was promoted from Security Supervisor to replace Bev Mehalik as Security Manager in Pennsylvania. Defendants contend they were unaware of the date Mr. Wolfe was recommended for the promotion.

On March 20, 2001, Dave Matt issued a letter to Picinich which stated that "[o]ver the last several weeks, UPS has carefully evaluated your request for a job-related accommodation ... [and] ... based upon the medical information that we have received, we have made a preliminary determination that you may be eligible for a reasonable accommodation pursuant to the [ADA]." Pl.'s Ex. 33, Dkt. No. 45. Matt concluded the letter by informing Picinich that a meeting was scheduled for April 4, 2001 so that UPS could continue its assessment of Picinich's request, and that Picinich should be prepared to discuss in detail

the specific accommodation he was requesting. See id.

At the April 4, 2001 meeting, Picinich, Robin Fey and Dave Matt discussed potential accommodations regarding the Preload Manager position. UPS, citing a memorandum issued to defendant Wilson from Dave Matt and Robin Fey regarding the commentary at the meeting, argues that, at the meeting, Picinich said there were no accommodations which would allow him to perform the Preload Manager position. See Harper Aff. at Ex. 20, Dkt. No. 40. Picinich testified, however, that at the meeting he indicated he was capable of performing this position. See Pl.'s Ex. E, Picinich Dep. II at 106:5–9, Dkt. No. 45.

According to defendant Wilson, a UPS region committee deemed Picinich to be a qualified individual with a disability pursuant to the UPS ADA procedure. See Pl.'s Ex. F, Dep. of Jeffrey Wilson, Mar. 19, 2003 at 14:2–15:13, 140:11–146:16, Dkt. No. 45. Defendants dispute the accuracy of Wilson's testimony by citing to the written UPS ADA procedure as evidence that the region committee was only authorized "to determine whether [Picinich] has a condition that may be a disability under the ADA." See Harper Aff., Ex. 16 at 319, Dkt. No. 40. According to defendants, UPS only determined that Picinich was "disabled" under its ADA policy, not, as Wilson testified, that Picinich was a qualified individual with a disability. See Defs.' Statement of Material Facts at ¶ 55, Dkt. No. 38. Further, defendants contend that UPS worked to identify a reasonable accommodation which would allow Picinich to return to work, citing as evidence a copy of its "Accommodation Checklist" completed by Picinich, Dave Matt and Robin Fey on April 4, 2001. See id., citing Harper Aff. at Ex. 19, Dkt. No. 40. Picinich disputes the accuracy of this allegation, citing the testimony of Robin Fey and defendant

Grover that UPS did not begin its ADA procedure when he was released for work in April 2000, *see* Pl.'s Ex. J, Fey Dep. at 77:11–25, 198:5–23, Dkt. No. 45; Pl.'s Ex. H, Grover Dep. at 154:19–156:7, Dkt. No. 45, and the testimony of Robin Fey that she did not recall whether she inquired about available positions outside the District on behalf of Picinich as he requested in January 2001, and that no essential job functions other than those for the Preload Manager position were discussed at the April 4, 2001 meeting, *see* Pl.'s Ex. J, Fey Dep. at 223:8–16, 228:18–23, Dkt. No. 45.

On April 13, 2001, Dave Matt issued a letter to Picinich wherein he stated that "after carefully reviewing your situation, we are aware of no available position at UPS at this time for which your [sic] are qualified and capable of performing the essential job functions with or without reasonable accommodation. If your condition or abilities change in the future, however, or if you become aware of an open position that you believe you are capable of performing, please contact me so that we may re-evaluate your situation." *See* Harper Aff. at Ex. 21, Dkt. No. 40. Picinich testified that he did not recall whether, at the time he received this letter, he was aware of any available manager positions in the Upstate N.Y. District that he was qualified to perform. *See* id., Picinich Dep. II at 107:3–12, Dkt. No. 40. Picinich simply states that he can perform the essential job functions of several jobs at UPS. *See* Pl.'s Response to Defs.' Statement of Material Facts at ¶¶ 83–88, Dkt. No. 47.

Picinich contested the decision of UPS' ADA committee through its EDR process, and a meeting was held on May 14, 2001 between Picinich, Wilson and Robin Fey to discuss same. Both of Picinich's EDR claims, regarding his reassignment to Preload Manager, *see supra,* at 490, as well as the ADA committee decision, were scheduled to be heard together on June 11, 2001 at mediation sponsored by UPS. Picinich cancelled the mediation prior to its commencement, ostensibly because he was given only five days notice that his ADA claim would be mediated along with his dispute regarding his reassignment to Preload Manager. *See* Picinich Aff. at ¶ 20, Dkt. No. 44.[8]

On June 4, 2001, Wilson notified Picinich that a position entitled "Dispatch Specialist/Yard Controller" opened up in Syracuse. By letter dated June 6, 2001, Wilson provided Picinich with a Job Breakdown Analysis (JBA) and other information regarding this position. On June 23, 2001, Picinich sent a letter to Wilson wherein he requested additional information about the physical requirements of the position. Attached to Picinich's letter was a copy of a letter from Dr. Kahn to Picinich, dated June 15, 2001, wherein Dr. Kahn stated he was unable to determine whether the position was "medically appropriate and safe" for Picinich to accept without more detailed information regarding the physical demands of the job, including, among other things, the availability and timing of breaks, equipment used, and frequency with which changes in body position can be

---

8. Picinich claims that he was informed by UPS on or about March 26, 2001 that he could not combine his ADA claim and his reassignment claim under the EDR process. Defendants note that he could not combine the two claims *at that time* because he had not yet followed the appropriate procedures for making a claim of an ADA violation. *See*

Pl.'s Ex. 48 at Dkt. No. 45. In any event, Picinich states that he attempted to contact the EDR coordinator for UPS, Eric Hoffman, on June 8 and 9, 2001 in order to cancel the mediation session scheduled for June 11, 2001. *See* Picinich Aff. at ¶¶ 21–22, Dkt. No. 44.

accommodated.[9] *See* Pl.'s Ex. 44, Dkt. No. 45.

Defendants contend that on July 11, 2001, Wilson sent Picinich written notification of the physical requirements of the Dispatch Specialist/Yard Controller position as well as pictures of the workspace, giving him until July 19, 2001 to consider same, but Picinich never accepted the job offer. *See* Harper Aff. at Ex. 25, Dkt. No. 40; Harper Aff. at Ex. 30, Picinich Dep. II at 123:15–25, Dkt. No. 40. Picinich testified that he never accepted nor rejected the job offer because he never received the July 11, 2001 letter from Wilson. *See* Pl.'s Ex. E, Picinich Dep. II at 123:15–19, 126:8–15, Dkt., No. 45.[10] Defendants argue that Picinich never followed up with Wilson about Picinich's request for additional information on the Dispatch Specialist/Yard Controller position, even though he alleges never receiving it. *See* Harper Aff. at Ex. 30, Picinich Dep. II at 123:15–25, Dkt. No. 40. However, Picinich contends that he made three phone calls in an attempt to speak to Wilson after he sent the June 23, 2001 letter. *See* Pl.'s Ex. B, Pl.'s Response to Defs.' First Set of Interrogs. at 15, Dkt. No. 45; Picinich Aff. at ¶ 26, Dkt. No. 44.

In any event, on June 26, 2001, Dr. Kahn reported that "[Picinich's] physical condition at this point in time has decompensated to the point where I do not feel that he can presently work even within the context of his previously indicated written release for return to work with restriction and accommodation. Therefore, I am going to consider him temporarily totally disabled from work at this point until we can resolve this acute episode." Harper Aff. at Ex. 27, Dkt. No. 40. Moreover, Dr. Kahn later testified that from May 25, 2001 until August 28, 2001, Picinich was totally disabled from working *in any position*, including the Dispatch Specialist/Yard Controller position as described in Wilson's letter of July 11, 2001. *See* Harper Aff. at Ex. 34, Kahn Dep. at 95:16–97:12, Dkt. No. 40 (emphasis added).

According to defendants, Picinich's short-term disability benefit terminated, and his long-term disability benefit commenced, on May 9, 2001. *See* Defs.' Statement of Material Facts at ¶ 62, Dkt. No. 38, *citing* Harper Aff. at Ex. 31, Wilson Dep. at 275:1–277:9, Dkt. No 40. Under long-term disability, Picinich's benefit was reduced to 60% of his salary from the full salary benefit he received under short-term disability. *See* id. Picinich contends that he received his last short-term disability payment in March 2001 and that his long-term disability commenced in April 2001. *See* Picinich Aff. at ¶ 15, Dkt. No. 44. In support of his argument, Picinich submitted a copy of a "Separation Form" signed by Robin Fey on May 9, 2001, which states that Picinich was terminated on February 1, 2001, and that his long-

---

9. Defendants assert that the Dispatch Specialist/Yard Controller position was "sedentary and primarily consisted of working at a computer terminal." Defs.' Statement of Material Facts at ¶ 67, Dkt. No. 38. Picinich disagrees, however, and notes that its purported essential job functions included assisting in moving packages up to 150 pounds as well as grasping, reaching, driving, and handling packages. *See* Pl.'s Ex. 37 at 60, Dkt. No. 45. Defendants assert that Picinich was aware that the Dispatch Specialist position required dispatching tractor trailers from an office set-

ting, but Picinich disagrees, correctly noting that his testimony did not refer to an office setting. *See* Harper Aff. at Ex. 30, Picinich Dep. II at 120:19–122:24, Dkt. No. 40.

10. Picinich argues that furthermore, Wilson testified he never sent the letter. However, the court's review of the cited transcript reveals that Wilson's testimony was that while he did not send the letter, he instructed another UPS employee to do so. *See* Pl.'s Ex. F, Wilson Dep. at 219:20–220:16, Dkt. No. 45.

term disability commenced on that date. *See* Pl.'s Ex. 42, Dkt. No. 45. Defendant Wilson testified that although the "summary plan" at UPS calls for short-term disability benefits to terminate after 12 months, Picinich received an extra two months of short-term benefits because, as of February 2001, UPS was "still in the process of trying to continue with the interactive process and the evaluation of potential accommodations and positions" and it was not until May 9, 2001 that "it was determined that, to be in compliance with the necessary record keeping on the administrative process whereby short-term disability ends and long-term disability begins according to the summary plan description, that [UPS] needed to go ahead and take this particular step." Harper Aff. at Ex. 31, Wilson Dep. at 275:1–20, Dkt. No. 40. Picinich's long-term disability benefit terminated on January 30, 2003. In a letter to Picinich informing him of such, the insurance carrier noted that, based on a vocational assessment of his case, they determined that he was capable of performing the jobs of Security Manager and Manager. *See* Pl.'s Ex. 47, Dkt. No. 45.

In March 2002, an Administrative Law Judge ("ALJ") for the Social Security Administration ("SSA") found that Picinich was entitled to Social Security Disability benefits, based on an application he filed in November 2000. The ALJ found that Picinich "has been under a disability, *as defined by the Social Security Act,* since January 21, 2000." *See* Harper Aff. at Ex.

28, Dkt. No. 40 (emphasis added). The ALJ also concluded that Picinich

> is unable to do sustained work-related physical activities in a work setting on a regular and continuing basis of 8 hours a day, for 5 days a week, or an equivalent work schedule. That ability is essential for employment and when a claimant lacks that ability *the provisions of Social Security Ruling 96–8p* justify a conclusion of disability. [Picinich's] occupational base is so markedly eroded that vocational adjustment to any work existing in significant numbers in the national economy may not reasonably be expected.

*Id.* (emphasis added). The UPS Flexible Benefits Plan stated that long-term disability benefits could be terminated for failure "to apply, reapply, and appeal any denials of Social Security Disability insurance benefit[s] ... to which you may be entitled, until all such applications and appeals are exhausted." *See* Pl.'s Ex. 22 at UPS00554, Dkt. No. 45.

Picinich filed a dual charge of discrimination with the Equal Employment Opportunity Commission ("EEOC") and the New York State Division of Human Rights in May 2001, alleging UPS failed to accommodate his disability. In September 2001 the EEOC issued Picinich a "right-to-sue" letter.

On December 7, 2001, Picinich commenced the present suit. In its current form, the complaint[11] sets forth three causes of action. As Count I, Picinich alleges that defendant UPS[12] failed to provide

---

**11.** Acting *pro se,* Picinich filed his initial complaint without the requisite allegation regarding issuance of an EEOC right-to-sue letter within the previous ninety days. Picinich, continuing *pro se,* cured this error by filing an amended complaint with the requisite EEOC right-to-sue letter attached. On June 24, 2002, now represented by counsel, Picinich

filed his Second Amended Complaint (hereinafter referred to as "Complaint").

**12.** While Picinich names UPS and UPS of America as defendants, he only names one entity, referred to as "defendant UPS" as the entity liable under Counts I and II of the Complaint. *See* Compl. ¶¶ 38, 39. Presumably, UPS of America is the parent company

him with a reasonable accommodation in violation of the ADA and NYHRL. *See* Compl. ¶ 38. Picinich alleges in Count II of the Complaint that defendant UPS terminated his employment due to his disability in violation of the ADA and NYHRL. *See id.*, ¶ 39. Finally, in Count III of the Complaint, Picinich alleges that the individual defendants, Grover, Canavan and Wilson, aided and abetted defendant UPS in committing violations of the NYHRL. *See id.*, ¶ 40.

Picinich seeks an order causing UPS to rehire him "at a sedentary supervisory or management position comparable to [his] prior supervisory and management positions for which [he] is qualified to perform with a reasonable accommodation" or in the alternative, damages in the amount of $3,107,034.80 against defendants jointly and severally for past and future lost wages and benefits as well as pension benefits. Picinich also seeks $300,000 in compensatory damages against defendants jointly and severally, or, in the alternative, against defendant UPS. Finally, Picinich seeks an award of litigation costs and expenses.

Defendants now move for summary judgment pursuant to Fed.R.Civ.P. 56, seeking dismissal of the entire complaint. Picinich opposes and cross moves for partial summary judgment pursuant to Fed. R.Civ.P. 56, seeking an order that the first two elements of his reasonable accommodation claim, to wit, that he was disabled within the meaning of the ADA and NYHRL and that defendants had notice of same, have been established as a matter of law. For purposes of their motion for summary judgment, defendants do not oppose a finding of disability and notice under Picinich's reasonable accommodation claim, as they argue that he cannot establish the final two elements of said claim, to wit, that he could perform the essential functions of his job with a reasonable accommodation, and that UPS failed to make such accommodations. However, in the event the court denies their motion for summary judgment, defendants oppose Picinich's cross motion.

## III. DISCUSSION

### A. Summary Judgment Standard

A motion for summary judgment shall be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). *See also Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986); *Peck v. Public Serv. Mut. Ins. Co.*, 326 F.3d 330, 337 (2d Cir.2003), *cert. denied*, —— U.S. ——, 124 S.Ct. 540, 157 L.Ed.2d 410 (2003). When deciding whether to grant a motion for summary judgment, "a court must construe the facts in the light most favorable to the nonmoving party and must resolve all ambiguities and draw all reasonable inferences

to UPS. *See* Defs.' Corporate Disclosure Statement, Dkt. No. 37. However, at the hearing regarding these motions, counsel for plaintiff was unable to clearly identify the corporate setup of defendants, UPS and UPS of America, except to state that he understands them to have the same corporate identity, and that UPS of America was initially named by plaintiff when he was acting *pro se*. At the hearing, plaintiff was notified that the court would not consider the claims under Counts I and II of the complaint against UPS of America unless he amended his complaint accordingly. Since plaintiff has failed to seek leave to amend his complaint further, and since the Complaint is devoid of allegations sufficient to state a claim against UPS of America or to establish this court's jurisdiction thereof, the court dismisses the Complaint as against defendant UPS of America only.

against the movant." *See Baisch v. Gallina,* 346 F.3d 366, 372 (2d Cir.2003), *citing Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). While the initial burden of demonstrating the absence of a genuine issue of material fact falls upon the moving party, once that burden is met, the non-moving party must "set forth specific facts showing that there is a genuine issue for trial," *see Koch v. Town of Brattleboro, Vermont,* 287 F.3d 162, 165 (2d Cir.2002), *citing* Fed.R.Civ.P. 56(c), by a showing sufficient to establish the existence of every element essential to the party's case, and on which that party will bear the burden of proof at trial. *See Peck,* 326 F.3d at 337.

## B. Count I: Failure to Provide a Reasonable Accommodation

Picinich alleges that defendant UPS failed to provide him a reasonable accommodation in violation of the ADA and NYHRL.

> According to the ADA,
>
> [n]o covered entity[13] shall discriminate against a qualified individual with a disability because of the disability of such individual in regard to [among other things] the advancement or discharge of employees, employee compensation, ... and other terms, conditions, and privileges of employment.

42 U.S.C. § 12112(a). The term "discriminate" is defined by the ADA as, among other things,

> [n]ot making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an ...

employee, unless [the employer] can demonstrate that the accommodation would impose an undue hardship on the operation of the business of such [employer].

42 U.S.C. § 12112(b)(5)(A). Pursuant to NYHRL,

> [i]t shall be an unlawful discriminatory practice for an employer ..., to refuse to provide reasonable accommodations to the known disabilities of an employee ... in connection with a job or occupation sought or held.

N.Y. Exec. L. § 296.3(a) (McKinney 2003). NYHRL also specifies that an employer is not required to provide "accommodations which can be demonstrated to impose an undue hardship on the operation of [the] employer's ... business, program or enterprise." N.Y. Exec. L. § 296.3(b).

 In order to establish a prima facie case of failure to provide a reasonable accommodation pursuant to the ADA and NYHRL,[14] Picinich must establish that (1) he is an individual with a disability as defined by the ADA, (2) UPS had notice of his disability, (3) he could perform the essential functions of his job with reasonable accommodation, and (4) UPS failed to make such accommodations. *See Lovejoy–Wilson v. NOCO Motor Fuel, Inc.,* 263 F.3d 208, 216 (2d Cir.2001); *Mitchell v. Washingtonville Cent. Sch. Dist.,* 190 F.3d 1, 6 (2d Cir.1999); *Romanello v. Shiseido Cosmetics Am. Ltd.,* 00–Civ.–7201, 2002 WL 31190169, at *7 (S.D.N.Y. Sept.30, 2002), *aff'd,* 71 Fed.Appx. 880 (2d Cir. 2003). However, UPS can defeat Picinich's claim of failure to accommodate if it can establish "(1) that making a reasonable

---

**13.** An employer, such as defendant UPS, is a "covered entity" pursuant to the ADA. *See* 42 U.S.C. § 12111(2).

**14.** Both Picinich's ADA and state law claims against defendant UPS will be considered to-

gether, as the analysis under the NYHRL "parallels that used in the ADA context." *Lovejoy–Wilson v. NOCO Motor Fuel, Inc.,* 263 F.3d 208, 212, n. 3 (2d Cir.2001).

accommodation would cause it hardship, and (2) that the hardship would be undue." *See Mitchell*, 190 F.3d at 6. *See also Romanello*, 2002 WL 31190169 at *7.

For purposes of its summary judgment motion only, UPS concedes that Picinich was disabled within the meaning of the ADA and NYHRL at all relevant times and that UPS had notice thereof. However, UPS argues that should its motion be denied, Picinich should not be granted summary judgment on his cross motion regarding these elements of his failure to accommodate claim. Therefore, the court will discuss all four elements of Picinich's failure to accommodate claim.

### 1. *Individual With a Disability*

■ Pursuant to the ADA, disability is defined as, among other things, "a physical or mental impairment that substantially limits one or more of the major life activities of [an] individual." *See* 42 U.S.C. § 12102(2)(A).[15] "[W]hether a person has a disability under the ADA is an individualized inquiry." *Sutton v. United Air Lines, Inc.*, 527 U.S. 471, 483, 119 S.Ct. 2139, 2147, 144 L.Ed.2d 450 (1999), *citing Bragdon v. Abbott*, 524 U.S. 624, 641–642, 118 S.Ct. 2196, 141 L.Ed.2d 540 (1998). In order to establish that Picinich is disabled under the ADA, he must show that (1) he has a mental or physical impairment, (2) which limits a major life activity (3) in a substantial manner. *See Colwell v. Suffolk County Police Dep't*, 158 F.3d 635, 641 (2d Cir.1998), *citing Bragdon*, 524 U.S. 624, 118 S.Ct. 2196. Also, it is important to note .that the court's focus must be on whether Picinich was disabled "at the time

the adverse action occurred." *Monroe v. Cortland County, New York*, 37 F.Supp.2d 546, 553 (N.D.N.Y.1999), *citing Heilweil v. Mount Sinai Hosp.*, 32 F.3d 718 (2d Cir. 1994).

■ NYHRL, defines disability as, among other things, "a physical ... impairment resulting from ... physiological ... or neurological conditions which prevent[ ] the exercise of a normal bodily function or is demonstrable by medically accepted clinical or laboratory diagnostic techniques."[16] *See* N.Y. Exec. L. § 292(21)(a) (McKinney 2003). The NYHRL definition of disability is broader than that of the ADA because it does not require identification of a major life activity that is substantially limited by an individual's impairment. *See Reeves v. Johnson Controls World Servs., Inc.*, 140 F.3d 144, 154–155 (2d Cir.1998). Thus, if the court finds that Picinich is disabled under the ADA, he is likewise disabled under NYHRL.

■ Initially, the court must determine whether Picinich had a physical or mental impairment during the time frame at issue. Plaintiff argues the applicable time frame is from January 2000 through July 2001. However, for the purposes of this action, the relevant time frame includes the period Picinich claims he was able to work with or without reasonable accommodation and the date of his termination from employment. The record reveals that from January 20, 2000 until July 20, 2000, Dr. Kahn reported that Picinich was temporarily totally disabled from working in the Preload Manager position, except for the approximate four day period in April 2000

---

**15.** According to the ADA, disability may also be established by a record of an impairment as described in § 12102(2)(A), or being regarded as having such an impairment. *See* § 12102(2)(A)(B)(C). However, Picinich relies exclusively on § 12102(2)(A).

**16.** Pursuant to NYHRL, disability is also defined as (b) a record of impairment or (c) a condition regarded by others as an impairment. *See* N.Y. Exec. L. § 292(21)(b)(c). However, Picinich relies upon § 292(21)(a) only.

when Dr. Kahn released Picinich for work within restrictions. On July 20, 2000, Dr. Kahn reported that Picinich was temporarily totally disabled from *any* type of work activities, and this restriction remained in place until Dr. Kahn released Picinich to work in a sedentary job on January 5, 2001. Deposition testimony of Dr. Kahn revealed that he determined Picinich to be unable to perform *any* type of work from May 25, 2001 until August 28, 2001. Nonetheless, the record shows that Picinich's employment with UPS terminated effective May 9, 2001 at the latest. *See supra*, at 496–97. Thus, the relevant time frame for this court's purpose of determining whether Picinich was disabled is January 20, 2000 through May 9, 2001.

According to EEOC regulations interpreting the ADA,[17] a "physical or mental impairment" is, among other things, any physiological disorder or condition affecting the neurological or musculoskeletal systems of the body. *See* 29 C.F.R. § 1630.2(h)(1). It is indisputable, based on the evidence submitted to the court, that Picinich had a condition which affected his musculoskeletal system during the relevant period. *See Colwell*, 158 F.3d at 639–640, 641–642; *Crispi v. Green Bus Line, Inc.*, No. 00–CV–7159, 2003 WL 1903264, at *5 (E.D.N.Y. Jan.7, 2003).

Next, the court must determine whether Picinich's impairment limited a major life activity. EEOC regulations define "major life activity" as a function "such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working." *See* § 1630.2(i). Although this list is not meant to be exhaustive, *see Bragdon*, 524 U.S. at 639, 118 S.Ct. at 2205, the term, "major life activity" has been interpreted to mean an activity that is "of central importance to daily life," *Toyota Motor Manufacturing, Kentucky, Inc. v. Williams*, 534 U.S. 184, 197, 122 S.Ct. 681, 691, 151 L.Ed.2d 615 (2002). The EEOC has identified other activities to be included in this category, such as, but not limited to, "sitting, standing, lifting, or reaching." *See Colwell*, 158 F.3d at 642, *quoting Ryan v. Grae & Rybicki, P.C.*, 135 F.3d 867, 870 (2d Cir.1998). Here, Dr. Kahn has indicated that from January 2000 until at least May 2001, Picinich was limited in the following areas: walking, standing, lifting, sitting, reaching and working. Picinich has established that his back injury affects an activity which is named by EEOC regulations as well as the Court of Appeals for the Second Circuit as a "major life activity," and therefore he has satisfied this requirement of the court's analysis. *See Colwell*, 158 F.3d at 642; *Reeves*, 140 F.3d at 150; *Ryan*, 135 F.3d at 870; *EEOC v. Yellow Freight System, Inc.*, No. 98–CIV–2270, 2002 WL 31011859, at *13 (S.D.N.Y. Sept. 9, 2002).[18]

---

**17.** The Supreme Court has questioned the level of deference due EEOC regulations interpreting the term "disability" and the elements thereof in the ADA. *See Sutton v. United Air Lines, Inc.*, 527 U.S. 471, 479–480, 119 S.Ct. 2139, 2145–46, 144 L.Ed.2d 450 (1999). However, noting that Congress has not delegated any agency the authority to define said term, the Court of Appeals for the Second Circuit has held that "until a more definite pronouncement is forthcoming, it remains the law of this Circuit that we will give weight to the EEOC's interpretations." *Muller v. Costello*, 187 F.3d 298, 312 n. 5 (2d Cir.1999).

**18.** Defendants argue that while for much of the period from January 2000 until May 2001 Picinich was limited in some ways, there were intervals of amelioration where, with medication or treatment, he would not have been considered an individual with a disability. It is true that the effects of measures to correct or mitigate an individual's impairment must be taken into account when determining whether that individual is substantially limited in a major life activity. *See Sutton*, 527 U.S. at 482, 119 S.Ct. at 2146. Picinich has submitted evidence that, even accounting for treatments and medications, he was still limit-

Finally, the court must determine whether a major life activity of Picinich's is limited in a substantial manner. According to EEOC regulation, "substantially limits" means

[u]nable to perform a major life activity that the average person in the general population can perform; or significantly restricted as to the condition, manner or duration under which an individual can perform a particular major life activity as compared to the condition, manner or duration under which the average person in the general population can perform that same major life activity.

*See* § 1630.2(j)(1)(i)(ii). Factors to be considered in determining whether an individual is substantially limited in a major life activity are "the duration or expected duration of the impairment" and "the permanent or long term impact, or the expected permanent or long term impact of or resulting from the impairment." *See* § 1630.2(j)(2)(i)(ii).

According to Dr. Kahn, at all relevant times Picinich was unable to stand, sit, or walk for, at most, 30 minutes at a time. Clearly these limitations exceed those that the average adult in the general population is subject to. *See, e.g., Yellow Freight System,* 2002 WL 31011859, at *13 (citations omitted) ("[C]ourts have generally found that the inability to sit for periods of an hour or less may constitute a substantial limitation on the ability to sit, while the ability to sit for longer periods does not.") It is also significant that, according to Dr. Kahn, Picinich's limitations were expected to be permanent. Moreover, the results of the IME, conducted in March 2000 on behalf of defendant UPS' insurance carrier, indicated that Picinich could work in a setting where "lifting could be limited to no more than 10 to 12 pounds on an occasional basis where he did not have to bend,

twist, stoop, push or pull repetitively, and where he had complete freedom to change position from sitting to standing at will." *See* Harper Aff. at Ex. 10, Dkt. No. 49. These limitations clearly are not representative of those of an average person. Therefore, Picinich has established as a matter of law that at all relevant times he was a disabled individual with a disability within the meaning of the ADA.

### 2. *Notice*

■ UPS cannot be held liable under the ADA unless, at the time of the relevant employment decisions, it had information that would have permitted a reasonable employer to conclude that Picinich was disabled. *See Young v. Westchester County Dep't of Soc. Servs.,* 57 Fed.Appx. 492 (2d Cir.2003) (unpublished opinion), *cert. denied,* —— U.S. ——, 123 S.Ct. 2652, 156 L.Ed.2d 658 (2003), *citing Bartlett v. N.Y. State Bd. of Law Examiners,* 226 F.3d 69, 85–86 (2d Cir.2000) (internal citation omitted); *Hedberg v. Indiana Bell Tel. Co.,* 47 F.3d 928, 932–33 (7th Cir.1995).

In support of his argument that UPS was aware of his disability beginning in at least January 2000, Picinich submitted evidence which shows that defendants Grover, Wilson and Canavan, as well as Robin Fey all had knowledge of his condition at various times throughout the relevant time period. In opposition, UPS points to the IME results as evidence that there is a question of fact as to what defendants knew regarding the extent of Picinich's condition. However, while the IME results indicated that Picinich could work, it also defined the limitations within which he could work, and it clearly stated that he had an impairment. UPS also argues that Dr. Kahn's reports indicated that Picinich's condition may improve with treat-

ed in the major life activity of "working" during the relevant time frame.

ment. However, those reports also indicated that Picinich's work limitations would likely be permanent.

Therefore, because Picinich has established that defendant UPS had information which would have permitted a reasonable employer to conclude he was disabled at all relevant times, and because defendant UPS has not presented evidence to the contrary, the second element of Picinich's failure to accommodate claim is established as a matter of law.

Accordingly, Picinich's cross motion for summary judgment is granted as the court has determined that he has established the first two elements of his failure to accommodate claim as a matter of law.

### 3. *Qualified Individual With a Disability*

The ADA defines a "qualified individual with a disability" as "an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8). In the present case, discussion of the terms "essential function," "reasonable accommodation" and "undue hardship" is necessary to determine whether Picinich meets the definition of a "qualified individual with a disability."

Essential functions are defined by regulation as those duties which are fundamental to the position in question, and not merely marginal. *See Jackan v. New York State Dep't of Labor,* No. 97–CV–0483, 1998 WL 760266 at *7 (N.D.N.Y. Oct.26, 1998), *aff'd,* 205 F.3d 562 (2d Cir.2000), *quoting Stone v. City of Mount Vernon,* 118 F.3d 92, 97 (2d Cir.1997); 29 C.F.R. § 1630.2(n)(1). A job function may be considered essential for several reasons, including, for example, because the reason for the existence of the position is to perform that function, because of the limited

number of employees available among whom that function can be distributed, or because of the highly specialized nature of the function. *See* § 1630.2(n)(2). According to the ADA, "consideration shall be given to the employer's judgment as to what functions of a job are essential, and if an employer has prepared a written description before advertising or interviewing applicants for the job, the description shall be considered evidence of the essential functions of the job." 42 U.S.C. § 12111(8). In addition, the applicable regulation provides that:

> [e]vidence of whether a particular function is essential includes, but is not limited to ... [t]he amount of time spent on the job performing the function; [t]he consequences of not requiring the incumbent to perform the function; [t]he terms of a collective bargaining agreement; [t]he work experience of past incumbents in the job; and/or [t]he current work experience of incumbents in similar jobs.

29 C.F.R. § 1630.2(n)(3).

The ADA defines "reasonable accommodation" as, among other things, "job restructuring, ... reassignment to a vacant position, acquisition or modification of equipment or devices, ... and other similar accommodations for individuals with disabilities." 42 U.S.C. § 12111(9)(B). According to the applicable regulation, "reasonable accommodation" means, among other things:

> [m]odifications or adjustments to the work environment, or to the manner or circumstances under which the position held or desired is customarily performed, that enable a qualified individual with a disability to perform the essential functions of that position; or ...

> [m]odifications or adjustments that enable a covered entity's employee with a

disability to enjoy equal benefits and privileges of employment as are enjoyed by its other similarly situated employees without disabilities.

29 C.F.R. § 1630.2(*o*)(1).

The ADA defines "undue hardship" as "an action requiring significant difficulty or expense," when considered in light of (1) the nature and cost of the accommodation, (2) the overall financial resources of the facility, the number of employees, the effect on expenses and resources, or the impact on operations, (3) the overall financial resources of the employer, the overall size of its business with respect to the number of employees, the number, type and location of its facilities, and (4) the type of operations of the employer, including the composition, structure, and functions of the workforce, geographic separateness, administrative or fiscal relationship of the facilities in relation to the employer. *See* 42 U.S.C. § 12111(10).[19] These factors are expounded upon by regulation to provide for "taking into consideration the availability of tax credits and deductions, and/or outside funding" when evaluating the nature and net cost of the accommodation. 29 C.F.R. § 1630.2(p)(2)(i). The regulations prescribe as an additional consideration "[t]he impact of the accommodation upon the operation of the facility, including the impact on the ability of other employees to perform their duties and the impact on the facility's ability to conduct business." § 1630.2(p)(2)(v).

In order to make out a prima facie case of failure to accommodate, Picinich must establish that he can satisfy the requirements of the Preload Manager position (or other position that he desires) without assistance, or that an accommodation exists that permits him to perform the job's essential functions. *See Jackan,* 1998 WL 760266 at \*9. As to the existence of an accommodation, Picinich bears both the burdens of production and persuasion. *See Jackan,* 205 F.3d at 567, *citing Borkowski v. Valley Central School District,* 63 F.3d 131 (2d Cir.1995). In order to identify an accommodation, Picinich must make at least a facial showing that an accommodation is possible. *See Jackan,* 205 F.3d at 568, *citing Mengine v. Runyon,* 114 F.3d 415, 420 (3d Cir.1997). However, as to the reasonableness of said accommodation, in other words, whether said accommodation would cause undue hardship to UPS, Picinich bears only the burden of production, and such a burden is "not a heavy one." *Jackan,* 205 F.3d at 567, *citing Borkowski,* 63 F.3d at 138. To meet this burden, Picinich "need only show that an 'accommodation' seems reasonable on its face," *US Airways, Inc. v. Barnett,* 535 U.S. 391, 401, 122 S.Ct. 1516, 152 L.Ed.2d 589 (2002), and "[i]t is enough for [Picinich] to suggest the existence of a plausible accommodation, the costs of which, facially, do not exceed its benefits," *Jackan,* 205 F.3d at 567, *citing Borkowski,* 63 F.3d at 138. The burden of persuasion that the particular circumstances of this case demonstrate undue hardship necessarily rests with UPS. *See Barnett,* 535 U.S. at 402, 122 S.Ct. at 1523; *Borkowski,* 63 F.3d at 138.

In support of its motion for summary judgment as to Picinich's claim for failure to accommodate, UPS argues that Picinich cannot establish that he is a qualified individual with a disability because (1) he was unable to perform the essential functions of the Preload Manager position at all relevant times, (2) he was unable to identify any accommodations which would allow him to perform the Preload Manager position, (3) he could not identify any vacant

---

**19.** NYHRL sets forth similar considerations in § 296.3(b)(i)-(iii).

positions in the Upstate N.Y. District that he could perform in light of his restrictions, and (4) a Social Security Administration ALJ found that Picinich was too disabled to work within the meaning of the Social Security Act between January 2000 and March 2002. Moreover, UPS argues, Picinich's requested accommodation, that UPS transfer him to a vacant position outside the Upstate N.Y. District, was an undue burden because (1) searching for such a position would be extensive and would require numerous work hours on the part of the Human Resources Manager, and (2) relocation costs would range from $30,000 to $90,000.

#### a. *Preload Manager Position*

██ Questions of fact exist regarding whether Picinich was able to perform the essential functions of the Preload Manager position at all relevant times. First, there is conflicting evidence as to the essential job functions of that position. By facsimile dated April 10, 2000, at the request of Robin Fey, a representative from CIGNA issued Dr. Kahn a description of the Preload Manager position, including its essential functions. *See* Pl.'s Ex. 16, Dkt. No. 45. Absent from this description is any mention of bending, lifting, standing, walking, kneeling, stooping, climbing, twisting, or driving, which were the activities Dr. Kahn listed in his modifications and/or restrictions, upon which Picinich's release for work was based. However, the essential functions of the Preload Manager position as set forth in the UPS Essential Job Functions Index for 2001 includes, among other things, the following requirements: travel by car or plane, demonstration of loading and unloading packages, bending, stooping, standing, walking, and lifting. *See* Pl.'s Exs. 35–37, Dkt. No. 45. Picinich argues that UPS erroneously defines the essential functions of many of its jobs, including the Preload Manager position, as

physical activities such as "bend/stoop" and "crouch/kneel" instead of responsibilities such as "directing administrative work" or "resolving customer issues." There is also conflicting evidence regarding whether Picinich told Robin Fey and Dave Matt during their February 4, 2001 meeting that he could perform the essential functions of the Preload Manager position, ostensibly because the parties disagree as to what those functions are. Which functions are essential, and whether Picinich could perform them, are material questions of fact for a fact finder to decide.

#### b. *Reassignment to a Vacant Position*

██ While Picinich does not identify an accommodation which would allow him to perform the essential functions of the Preload Manager position, he argues that transfer to a vacant management level position is a reasonable accommodation. In order to establish that UPS failed to accommodate him by transfer to another position, Picinich must establish that a vacancy existed for a position of which he could perform the essential functions. *See Jackan*, 205 F.3d at 568, *citing Mengine*, 114 F.3d at 420. Once Picinich meets this burden, summary judgment will not be appropriate unless UPS makes a showing that it provided some other accommodation, or alternatively, that a transfer would cause it undue hardship. *See Norville v. Staten Island Univ. Hosp.*, 196 F.3d 89, 99 (2d Cir.1999); *Borkowski*, 63 F.3d at 142. It is also important to note that although a reasonable accommodation may include reassignment of Picinich to a vacant position for which he is qualified, the ADA does not require UPS to create a new position for Picinich or move another employee from a previously held position in order to accommodate him. *See Norville*, 196 F.3d at 99; *Romanello*, 2002 WL

31190169, at *8; *Needle v. Alling & Cory, Inc.,* 88 F.Supp.2d 100, 107 (W.D.N.Y. 2000).

UPS argues that while it searched for vacant positions within its Upstate N.Y. District, it was unable to locate any that Picinich could perform within his physician imposed restrictions. The record shows that in January 2001, Picinich asked Robin Fey if he could transfer to a position outside the District, to which she responded that she "did not know but [ ] would ask." A Security Manager position was filled in Pennsylvania on February 1, 2001 by Tom Wolfe. *See* Pl.'s Exs. 30, 31, Dkt. No. 45. Although UPS contends it is unaware of the date Mr. Wolfe was recommended for this position, that alone does not overcome the fact that Picinich has met his burden of identifying a vacant position.

 Next, UPS argues that it was not required to transfer him to a position outside the District because it does not have a policy of transferring employees for purposes of reasonable accommodation.[20] Here, UPS misses the point. Because the intent of the ADA is not to give disabled employees preferential treatment, reassignment of a disabled employee to another facility is a reasonable accommodation only where it is the regular practice or policy of the employer to transfer employees between facilities or where the employer is contractually obligated to do so. *See Lovejoy–Wilson,* 263 F.3d at 218; *Bates v. Long Island Railroad Co.,* 997 F.2d 1028, 1035–1036 (2d Cir.1993). *See also Emrick v. Libbey–Owens–Ford Co.,* 875 F.Supp. 393, 398 (E.D.Tex.1995). Therefore, the question is not whether UPS has a policy of transferring disabled employees for purposes of reasonable accommodation, the question is whether it has a policy of trans-

ferring employees in general. Picinich has submitted deposition testimony of the three individual defendants, all managers at UPS, regarding their employment history with the company, including several transfers each between facilities in different districts. *See* Pl.'s Ex. I, Dep. of Brendan Canavan, Feb. 26, 2003, 8:2–16, 9:7–10:21, 18:3–19:16, Dkt. No. 45; Pl.'s Ex. F, Dep. of Jeff Wilson, Mar. 19, 2003, 10:19–11:6, 14:18–15:6, Dkt. No. 45; Pl.'s Ex. H, Dep. of James Grover, Mar. 20, 2003, 8:3–25, 10:3–11, 11:5–21, 12:4–13:7, Dkt. No. 45. Picinich has also submitted lists of UPS promotions and job transfers for 2000 and 2001, including some which specify reassignment across districts. *See* Pl.'s Exs. 29–31, Dkt. No. 45. Therefore, a material question of fact exists as to whether there was a policy in existence at UPS during the relevant time periods to reassign management level employees between districts.

Nonetheless, UPS argues that Picinich could not perform the essential functions of the Security Manager position, and therefore, he cannot meet his burden of identifying a vacancy for which he was qualified. Picinich contends, however, that there is a dispute as to the essential functions of the Security Manager position. For example, in its response to interrogatories, UPS stated that the essential functions of the Security Manager position included lifting, manipulating, or otherwise moving packages weighing up to 70 pounds, when in fact, the UPS Job Functions Index for 2001 did not include the foregoing functions as a requirement of said position. However, the referenced Job Functions Index did list, among other things, the following essential functions for the Security Management position: "bend,

---

**20.** However, according to the UPS ADA Reasonable Accommodation policy, "[t]he transfer of union free employees between centers and districts is permissible and may qualify as a reasonable accommodation in some circumstances." Pl.'s Ex. 32, Dkt. No. 45.

stoop/squat, crouch/kneel, climb stairs and walk intermittently throughout the workday." Pl.'s Ex. 35, Dkt. No. 45. The foregoing functions are clearly outside the work restrictions set forth by Dr. Kahn on January 5, 2001, which included permanent restrictions from, among other things, bending, climbing, stooping, kneeling, and squatting. Dr. Kahn also stated on that same date that Picinich needed to work, on a permanent basis, in a sedentary position. Therefore, to the extent those functions are, in fact, essential, Picinich cannot meet his burden with regard to the Security Manager position.

However, the employer's identification of a function as essential is only one consideration for the court when determining whether an employee is qualified for a position under the ADA. "To avoid unfounded reliance on uninformed assumptions, the identification of the essential functions of a job requires a fact-specific inquiry into *both* the employer's description of a job and how the job is actually performed in practice." *Young v. Central Square Sch. Dist.*, 213 F.Supp.2d 202, 213 (N.D.N.Y.2002), *quoting Borkowski*, 63 F.3d at 140 (emphasis added). Picinich argues that UPS misconstrues the definition of essential function as the physical requirements of the position, and contends that, based on his former experience for over five years as a Security Manager with UPS, he can perform the essential functions of the job with reasonable accommodations. *See* Picinich Aff. at ¶¶ 27–30, Dkt. No. 44; Aff. of Richard M. Picinich, Nov. 25, 2003, ¶ 5, Dkt. No. 52. A review of the description of the Security Manager position as it is listed in the UPS Job Functions Index reveals boilerplate language which purports to set forth the essential functions for a broad range of positions, including, in addition to Security Manager, management positions in over

thirty different categories such as, for example, finance, payroll, and customer service. The essential functions of these positions include, among other things, working in a *seated positions during a portion of the day, reporting to work timely, and working cooperatively in a diverse environment. See* Pl.'s Ex. 35, Dkt. No. 45. Picinich's description of the Security Manager position is much more specific. His alleged duties in that position included "visually inspect[ing] the condition of UPS property such as lighting, fence lines, and parking lot, and address[ing] any security concerns." Picinich Aff. at ¶ 28, Dkt. No. 44. As a Security Manager, according to Picinich, he "would also attend meetings, discuss security investigations with [UPS] employees, evaluate open and closed cases, conduct investigations, review high value damage claims by customers, and conduct administrative duties such as payroll and supervisor attendance records." Id. Picinich claims that the position would also require him to conduct package audits, which includes inspecting packages to determine if there is any damage, but that he could perform this function while remaining within his physical restrictions by keeping the package at waist level and safely rotating it while it is placed on a conveyor belt. *See* id. at ¶ 29. Picinich has therefore established that there are material questions of fact as to the essential functions of the Security Manager position.

### c. *Undue Hardship*

Nonetheless, UPS argues, even if Picinich meets his burden of identifying a vacant position for which he is qualified, it can still prevail on its motion for summary judgment because to relocate Picinich to a position outside the Upstate N.Y. District would impose an undue hardship.

When deciding whether an accommodation would impose an undue hardship on an employer, it is important to keep in mind that "undue hardship" is a relational term, and as such, consideration is due to the benefits to others that will result as well as the costs the employer is asked to assume. *See Stone,* 118 F.3d at 98. Here, as the employer, UPS bears the burdens of production and persuasion regarding their assertion of undue hardship, and as such, it "must analyze the hardship sought to be imposed through the lens of the factors listed in the regulations.... If [UPS] can carry this burden, it will have shown both that the hardship caused by the proposed accommodation would be undue in light of the enumerated factors, and that the proposed accommodation is unreasonable and need not be made." *Id., quoting Borkowski,* 63 F.3d at 139. However, UPS is not required to "analyze the costs and benefits of the proposed accommodation with mathematical precision." *Id., quoting Borkowski,* at 140.

Here, UPS argues that locating a position or positions for Picinich outside the Upstate N.Y. District would impose an undue hardship because such a process would be extensive and would require numerous work hours on the part of the Human Resources Manager and because the costs of relocating Picinich to another district would range from $30,000 to $90,000.

UPS notes that each District functions as a business unit with its own staff, managers, and operations,[21] and as such, requiring it to conduct a nationwide search for a new position for Picinich would be "impractical and unduly burdensome." UPS alleges that defendant Wilson, as the Human Resources Manager, would have to spend a considerable amount of time contacting the Human Resources Managers in other districts to seek the intervention of Regional Managers in order to accomplish this task, and to do so every time an employee requested a transfer is unreasonable. As it is, UPS argues, Wilson searched the Upstate N.Y. District for a position for Picinich, which consists of 22 facilities and over 4000 employees.

Moreover, UPS cites a declaration by Wilson wherein he contends that reassignment could cost UPS between $30,000 to $90,000. *See* Decl. of Jeffrey Wilson, Oct. 7, 2003 at ¶ 2, Dkt. No. 39. Picinich argues that, as an employee-at-will, UPS is not required to pay his relocation costs. Further, Picinich has stated that in 2001, he would have been willing to incur and pay any expenses associated with reassignment to another UPS facility, including moving expenses. *See* Picinich Aff. at ¶ 37, Dkt. No. 44.

UPS has claimed a financial hardship, but has not submitted evidence of its overall financial resources in order to allow a meaningful consideration of same in relation to the alleged financial burden involved in accommodating Picinich. Moreover, Picinich's suggestion that he would have assumed the costs associated with his relocation create an "uphill battle" for UPS to meet its burden of establishing undue hardship. *See Lovejoy–Wilson,* 263 F.3d at 221. UPS is thus left with its remaining allegation that the mere task of

---

21. UPS is divided into seven regions within the United States, each consisting of business units, referred to as "Districts," which have their own operations, staff and budget. *See* Defs.' Statement of Undisputed Material Facts, at ¶ 4, Dkt, No. 38; Pl.'s Resp. to Defs.' Statement of Undisputed Material Facts, at ¶ 4, Dkt. No. 47. The Upstate N.Y. District, which is located within the East Central Region of UPS, includes an area covering 50,000 miles, "from Albany to Potsdam Syracuse, and down to Binghamton and Poughkeepsie." *See id.* at ¶ 5.

locating a vacant position for Picinich in another district imposes an undue burden on its operations. This, without more, is not enough to outweigh the potential benefits to Picinich in affording him the requested accommodation. Therefore, material questions of fact remain regarding the issue of undue hardship.

### d. *Judicial Estoppel and Entitlement to Social Security Disability*

Finally, UPS contends that Picinich is judicially estopped from asserting that he meets the definition of a qualified individual with a disability because he made contrary assertions in his application for Social Security Disability benefits, which was approved in March 2002.

According to the doctrine of judicial estoppel, a party cannot assert "a factual position in a legal proceeding that is contrary to a position previously taken by [that party] in a prior legal proceeding." *Mitchell*, 190 F.3d at 6, *quoting Bates*, 997 F.2d at 1037. A party invoking judicial estoppel, here UPS, must establish that the other party, here Picinich, took a contrary position in a prior proceeding, which was adopted by the tribunal in that proceeding "in some manner, such as by rendering a favorable judgment." *Id.*, *citing Bates*, at 1038; *Maharaj v. Bankamerica Corp.*, 128 F.3d 94, 98 (2d Cir.1997). Prior inconsistent statements made to administrative agencies, "such as to the Social Security Administration in applying for disability benefits, may also give rise to judicial estoppel." *Mitchell*, 190 F.3d at 6, *citing Simon v. Safelite Glass Corp.*, 128 F.3d 68, 71 (2d Cir.1997).

When SSA determines that an individual is disabled within the meaning of the Social Security Act, it does not take into account whether or not the individual could perform the essential functions of his or her job with a reasonable accommodation pursuant to the ADA. *See Cleveland v. Policy Mgt. Sys. Corp.*, 526 U.S. 795, 803, 119 S.Ct. 1597, 1602, 143 L.Ed.2d 966 (1999). Therefore, a finding of disability by SSA alone does not prevent Picinich from establishing that he is a qualified individual with a disability for purposes of an ADA claim. *See id.* However, where factual assertions made before SSA conflict with those made later in an ADA case, the plaintiff must provide a sufficient explanation in order to prevent being estopped from asserting same. *See id.* at 806–807, 119 S.Ct. 1597. In order to defeat a motion for summary judgment, the explanation "must be sufficient to warrant a reasonable [fact finder's] concluding that, assuming the truth of, or the plaintiff's good faith belief in, the earlier statement, the plaintiff could nonetheless perform the essential functions of the job, with or without reasonable accommodation." *See Parker v. Columbia Pictures Ind.*, 204 F.3d 326, 333 (2d Cir.2000), *quoting Cleveland*, 526 U.S. at 807, 119 S.Ct. 1597.

Here, UPS contends, in rendering his decision that Picinich is disabled, the SSA ALJ took into consideration Picinich's assertions regarding his physical restrictions after he became disabled, as well as the requirements of the positions he previously held at UPS, including the Security Manager position, and therefore, Picinich cannot now claim that he was able to perform the essential functions of those positions. Specifically, UPS contends that Picinich made contradictory statements to SSA and this court when, in his application for Social Security Disability benefits, Picinich described the essential functions of the Security Manager position as well as his physical restrictions and stated that he could not attend work due to extreme pain, but later told this court he could perform the essential tasks of that position. *See*

Aff. of Jonathan J. Harper, Nov. 12, 2003 at Ex. 5, Dkt. No. 49. Therefore, UPS argues, as in *Mitchell,* where the court held that plaintiff there was judicially estopped from asserting, as a factual matter, that he was capable of performing work other than in a sedentary position, Picinich should be estopped from asserting that he can perform the essential functions of any of the positions he named in his work history as part of his application to SSA for disability benefits. *See Mitchell,* 190 F.3d at 7.

However, unlike the plaintiff in *Mitchell,* Picinich did not make contrary factual statements to SSA, CIGNA or this Court. *See Mitchell,* 190 F.3d at 7. In *Mitchell,* the plaintiff there told the Worker's Compensation Board and SSA that he was unable to walk or stand for any length of time, but later told the court he was able to stand and walk for a substantial portion of the day. *Id.* Here, in his application for disability benefits, Picinich stated that he "could no longer attend work due to extreme pain while performing [his] job duties" and that his condition limits his ability to lift, bend, twist, climb stairs, stand or sit too long, or drive for more than twenty minutes. *See* Harper Aff. at Ex. 5, Dkt. No. 49. These statements were in reference to the last position he held at UPS, to wit, the Preload Manager position. Picinich has not made contrary assertions to this court regarding his ability to perform the essential functions of that position without accommodations for his limitations. Nor has he made contrary assertions to this court about his limitations in the areas of lifting, bending, twisting, climbing, standing, sitting or driving.

In fact, assuming arguendo that "stooping, bending, crouching and kneeling" are essential job functions of the positions Picinich listed in his disability application, he offered a sufficient explanation for how he can perform those jobs with a reasonable accommodation, consistent with the Court's ruling in *Cleveland. See* Picinich Aff. at ¶¶ 27–34, Dkt. No. 44. *See also Cleveland,* 526 U.S. at 807, 119 S.Ct. 1597.

Therefore, because the SSA ALJ did not take into account whether Picinich could perform the essential functions of any position at UPS with a reasonable accommodation, and because Picinich did not make assertions of fact to this Court contrary to those he made to SSA upon which it relied in approving his application for disability benefits, he cannot now be judicially estopped from asserting that he is a qualified individual with a disability for purposes of his claim under the ADA.

In summary, regarding the third element of Picinich's failure to accommodate claim, there are genuine issues of material fact remaining regarding the following issues: (1) which functions of the Preload Manager and Security Manager positions are essential and whether Picinich could perform either of those positions, (2) whether UPS had a policy of reassigning management level employees to positions across districts between January and May of 2001, and (3) whether the accommodation Picinich requested, to wit, transfer to a position outside the Upstate N.Y. District, would have caused UPS undue hardship.

### 4. *Whether UPS Provided Reasonable Accommodation*

In order to make out a prima facie case of failure to accommodate, Picinich must also demonstrate that UPS refused to make a reasonable accommodation. *See Mitchell,* 190 F.3d at 6. UPS was not required to provide any particular accommodation Picinich requested, only some accommodation, as long as it was reasonable. *See Fink v. New York City Dep't of Per-*

*sonnel,* 53 F.3d 565, 567 (2d Cir.1995); *Romanello,* 2002 WL 31190169 at *8.

### a. *Interactive Process*

Essentially, Picinich argues that UPS refused to accommodate him when it failed to engage in an interactive process in order to identify his limitations and the appropriate accommodations which would allow him to resume working. UPS argues that it is Picinich who failed to engage in this process.

The ADA envisions that employees and employers will work together in "an informal, interactive process ... [which] should identify the precise limitations resulting from the disability and potential reasonable accommodations that could overcome those limitations." *See* 29 C.F.R. § 1630.2(o)(3). *See also Lovejoy–Wilson,* 263 F.3d 208, 218–219; *Jackan,* 205 F.3d at 566. While Picinich has the burden of identifying an accommodation, UPS is obliged to take affirmative steps to assist Picinich in this process. *See Jackan,* 205 F.3d at 568 n. 4. Included in this obligation is the requirement that UPS communicate with Picinich in good faith. *See Mengine,* 114 F.3d at 420. Failure of an employer to act in good faith will preclude summary judgment against an employee on a claim of failure to accommodate. *See Taylor,* 184 F.3d at 318–319. Nonetheless, courts have not "found the interactive process to be an independent source of liability irrespective of whether a reasonable accommodation was actually offered (or conversely, irrespective of whether one was actually possible). Rather, the failure to engage in an interactive process is relevant only where it leads to the more fundamental failure to provide an accommodation." *Yellow Freight System,* 2002 WL 31011859, at *24, *citing Kvorjak v. Maine,* 259 F.3d 48, 52 (1st Cir.2001).

 In order to show that UPS failed to participate in the interactive process, Picinich must demonstrate that (1) UPS knew about his disability, (2) he requested accommodations or assistance for his disability, (3) UPS did not make a good faith effort to assist him in seeking accommodations, and (4) he could have been reasonably accommodated but for the lack of good faith. *See Taylor v. Phoenixville Sch. Dist.,* 184 F.3d 296, 319–320 (3d Cir. 1999). However, where an employer makes reasonable efforts to communicate with an employee, liability under the ADA will not attach, and likewise, where the employee causes the interactive process to collapse, the employer will not be liable. *See Donofrio v. New York Times,* 99–CV–1576, 2001 WL 1663314 at *6–7 (S.D.N.Y. Aug.24, 2001) (Mag. J. Francis), *adopted by,* 2002 WL 230820 (S.D.N.Y. Feb.14, 2002); *Economou v. Caldera,* 99–Civ.–12117, 2000 WL 1844773 at *23–24 (S.D.N.Y. Dec.18, 2000).

 First, Picinich argues that UPS failed to engage in the interactive process when, despite having knowledge of his disability as early as January 2000, UPS did not commence its internal ADA procedure until April 2000. Moreover, Picinich contends that UPS gave misleading information to Dr. Kahn regarding the Preload Manager position and, after suggesting to Picinich that he could perform the position within his restrictions and that there would be a supervisor there to assist him, when Picinich arrived at work, the supervisor who was to assist him claimed he could not do so because he was in a knee brace.

Next, Picinich contends that after April 2000, he repeatedly asked UPS to return to work within his restrictions, to no avail. Further, Picinich argues, even though Dr. Kahn released him to work in January 2001, UPS did not meet with him to discuss possible accommodations until April

2001. According to Picinich, during this time many transfers of management personnel took place at UPS and vacant positions were filled which he could have performed. Specifically, Picinich argues that UPS failed to engage in any meaningful communication with him when they failed to discuss the opening of the Security Manager position in Pennsylvania. Picinich notes that when he finally met with UPS representatives in April 2001, the discussion was limited to the Preload Manager position and, despite all of his previous attempts to transfer, he was told that there was a freeze on job openings and promotions as of the day prior to the meeting. Picinich alleged he was then escorted from the property after requesting to locate job vacancies, and was later effectively prevented from finding any vacancies.[22]

Picinich concludes that by delaying meeting with him to discuss an accommodation and failing to assist him in finding vacant positions, UPS acted in bad faith and impeded the interactive process. Therefore, according to Picinich, UPS should not prevail on its motion for summary judgment.

UPS argues that it accommodated Picinich when it attempted to have him return to work in April 2000, and that, despite its instructions that Picinich work within his restrictions, he failed to do so. UPS contends that the part time supervisor, Scott Briggs, was not meant to be an accommodation, and that, as a supervisor himself, Picinich was authorized to direct others to perform functions that were outside of his restrictions.

Next, UPS argues that in January 2001, it initiated its 10–step ADA procedure to determine whether Picinich could return to the Preload Manager position with or without reasonable accommodation. This procedure involved collecting information from Picinich and submitting same to the District and Region levels of UPS for a determination. Once said determination was received, Dave Matt scheduled a meeting between himself, Picinich and Robin Fey to review possible accommodations. Said meeting, which occurred in April 2001, resulted in UPS concluding that Picinich could not perform the Preload Manager position with or without reasonable accommodation. UPS contends that it also searched for alternative positions that Picinich could perform within his restrictions, but did not find one until June 2001, when defendant Wilson located an opening for a Yard Controller/Dispatch position in Utica. However, according to UPS, Picinich did not respond to its letter offer, and although Picinich claims he never received it, he did have communications with defendant Wilson about same, and never followed up when he failed to receive the letter. Therefore, UPS concludes, because Picinich allowed the interactive process to collapse, it is not liable, and Picinich cannot now claim that it refused to accommodate him.

---

**22.** Picinich asserts that he sought positions in New Jersey, which were at telephone centers where packages were not processed and thus required limited bending. *See* Pl.'s Ex. M, Dep. of John Ventre, May 9, 2003 at 52:4–53:18, Dkt. No. 45. Picinich also asserts that he can perform the essential job functions of several other positions, *see* Picinich Aff. at ¶ 40, Dkt. No. 44, and the record shows that some of these positions occur primarily in an office setting, *see* Pl.'s Ex. J., Fey Dep. at 109:21–24, Dkt. No. 45; Pl.'s Ex. F, Wilson Dep. at 245:8–246:14, Dkt. No. 45. Because he was not allowed access to conduct a proper search for available positions, which is relevant to whether UPS refused to accommodate him, Picinich contends he was unable to discover whether vacancies existed, which is also relevant to whether he is a qualified individual with a disability. *See supra*, at 505–07.

Before discussing these arguments, it is worth reviewing the relevant time frames regarding Picinich's condition and work restrictions. From January 20, 2000 until July 20, 2000, Dr. Kahn reported that Picinich was temporarily totally disabled from working in the Preload Manager position, except for the approximate four day period in April 2000 when Dr. Kahn released Picinich for work within certain restrictions. On July 20, 2000, Dr. Kahn reported that Picinich was temporarily totally disabled from *any* type of work activities, and this restriction remained in place until Dr. Kahn released Picinich to work in a sedentary job on January 5, 2001. Deposition testimony of Dr. Kahn revealed that he determined Picinich to be unable to perform *any* type of work from May 25, 2001 until August 28, 2001.

Therefore, to the extent the parties discuss the June 2001 offer by UPS to Picinich regarding the opening for the Dispatch/Yard Controller Position in support of their respective arguments, same is irrelevant since it is clear that Picinich was unable to work in *any* position at that time.

### i. *April 2000*

Although there are clearly questions of fact regarding whether UPS refused to accommodate Picinich once Dr. Kahn released him for work on April 10, 2000, Picinich's argument that UPS failed to engage in the interactive process during the period prior to April 10, 2000 is dubious. During this time, Dr. Kahn's reports indicated that Picinich was unable to return to the Preload Manager position, even with an accommodation. Moreover, Picinich does not claim that he requested reassignment to another position during that time. However, it is clear that once UPS became aware that Picinich was released for work, it was required to act in good faith to assist him in finding accommodations. *See Donofrio*, 2001 WL 1663314 at *6–7; *Economou*, 2000 WL 1844773 at *23–24. Picinich argues that when he met with UPS representatives to discuss his return to work on April 10, 2000, they did not ask him to identify any accommodations, but merely instructed him to work within his restrictions, and that a part time supervisor would be there to assist him. UPS' response that Picinich was authorized to direct others to perform functions that were outside of his restrictions does little to overcome the questions of fact raised by Picinich regarding whether UPS refused to accommodate him in April 2000.

### ii. *April 2000 through January 2001*

From April 14, 2000 until July 20, 2000, Dr. Kahn's reports indicated that Picinich was unable to return to the Preload Manager position, even with an accommodation. From July 20, 2000 until January 5, 2001, Picinich could not work in any position, with or without an accommodation, according to Dr. Kahn. Picinich argues that he first requested reassignment to another position during a conversation with Robin Fey on June 6, 2000. *See* Pl.'s Ex. J, Fey Dep., 148–149, Dkt. No. 45. Therefore, there is a short period of time where Picinich may have been deemed able to work in another position with or without accommodation, after Picinich requested reassignment. Picinich alleges that UPS failed to provide him with information about job vacancies during, and after, this time period, even though it was required to do so.

Although UPS argues that it had no affirmative duty to assist Picinich in locating job vacancies outside the District, *see Mitchell*, 190 F.3d at 9, whether such a duty exists relates to the outstanding question of material fact regarding wheth-

er UPS has a policy of reassigning management level employees between districts, *see supra* at 505–07. This is because, as previously stated, the intent of the ADA is to ensure that disabled employees are treated the same as all other employees. *See Mitchell,* 190 F.3d at 9, *citing Wernick v. Federal Reserve Bank of New York,* 91 F.3d 379, 384–85 (2d Cir.1996).

### iii. *January 2001 through May 2001*

Effective January 5, 2001, when Dr. Kahn again released Picinich to work, UPS alleges it began its 10–step ADA procedure. Picinich argues that, notwithstanding this allegation, UPS failed to engage in the interactive process because he did not meet with UPS representatives to discuss accommodations until April 4, 2001.

UPS submitted a copy of its written 10–step ADA procedure. According to this procedure, a meeting with the employee is the fifth step, to be completed after the following: (1) commencement of the process, (2) gathering medical information, (3) evaluation of whether the employee has a disability, and (4) notification of the employee. *See* Harper Aff. at Ex. 16, Dkt. No. 40. The estimated completion time for the first four steps is approximately six weeks from the date UPS receives a request for an accommodation. *See* id. Considering that Dr. Kahn continually submitted his medical reports to Robin Fey throughout the period that Picinich was out of work, and considering that Picinich requested accommodations prior to January 5, 2001, it is questionable whether UPS engaged in the interactive process in a timely matter in light of the fact that its ADA procedure took twice as long as estimated prior to its meeting with Picinich. Therefore, Picinich has raised another material question of fact regarding whether

UPS refused to provide him with an accommodation.

### b. *Compensation*

UPS contends that it provided Picinich with his full salary from February 1, 2000 until May 9, 2001, and that this was a reasonable accommodation. It is true that the ADA contemplates that a leave of absence is an appropriate form of reasonable accommodation. *See Romanello,* 2002 WL 31190169, at *9, *citing Powers v. Polygram Holding, Inc.,* 40 F.Supp.2d 195, 199 (S.D.N.Y.1999). *See also Criado v. IBM Corp.,* 145 F.3d 437, 443 (1st Cir.1998). Picinich argues, however, that UPS fails to cite any authority that a disability benefit provided as compensation for employment is a reasonable accommodation under the ADA. Even if such a benefit can be considered a reasonable accommodation, Picinich argues, unlike the plaintiff in *Romanello* who asked for three separate leaves of absence, he never requested a leave of absence, and instead was continually requesting to return to work. *See* Tr. at 27–28, Dkt. No. 57, *citing Romanello,* 2002 WL 31190169, at *9. Also, Picinich argues, unlike the plaintiff in *Romanello,* who never contacted her employer after she was able to return to work, Picinich contends he was in constant contact with UPS throughout his disability leave. *Id.* Moreover, Picinich argues that because his disability benefit was contractual in nature, it cannot be considered a reasonable accommodation.

First, Picinich's claim that there is no authority to support a finding that a disability benefit like the one he received from UPS is a reasonable accommodation is unfounded. In *Criado,* for example, the Court of Appeals for the First Circuit found that defendant IBM Corporation had a policy of providing its employees with 52 weeks of paid disability leave, and

held that such was a reasonable accommodation within the meaning of the ADA. *See Criado,* 145 F.3d at 444. Likewise, Picinich's argument that his case is distinguishable because he never asked for a leave of absence, and therefore, his disability compensation is not to be considered a reasonable accommodation cannot be reconciled with previously cited caselaw which holds that an employer is not required to provide the accommodation requested by a disabled employee, only some reasonable accommodation. *See supra,* at 510. Finally, Picinich's contention that a benefit, which is a contractual obligation, may not be considered a reasonable accommodation pursuant to the ADA is dubious. Such a holding would be contrary to the policy of the ADA to treat disabled and non disabled employees alike, and could not be reconciled with the previously cited rule of law that employers are not required to reassign a disabled employee where there is no contractual duty or policy in place for reassignment of non disabled employees. *See supra,* at 506.

Nonetheless, UPS points out that even if its disability compensation plan was contractual,[23] and even if payments pursuant to a contractual obligation cannot be considered a reasonable accommodation, it was only required to pay Picinich his full salary under this plan for twelve months. UPS argues that since it continued to pay Picinich his full salary for two months beyond this twelve month period while it engaged in the ADA procedure to assist Picinich in finding an accommodation, those two additional months of salary constitute a reasonable accommodation.

Picinich, although he contends that any disability payments he received from UPS are not a reasonable accommodation, disagrees with the time period that UPS suggests it paid Picinich his full salary. According to Picinich, his short-term disability benefit (at full pay) terminated and his long-term disability (at 60% pay) commenced in March 2001, not May 2001 as UPS argues. *See* Picinich Aff. at ¶ 15, Dkt. No. 44. According to a copy of a "Separation Form" signed by Robin Fey on May 9, 2001, Picinich's short-term disability benefit terminated and his long-term disability benefit commenced on February 1, 2001. *See* Pl.'s Ex. 42, Dkt. No. 45. At his deposition, Wilson explained that the discrepancy on the form was due to administrative requirements, and that Picinich actually received his full salary until May 9, 2001. *See* Harper Aff. at Ex. 31, Wilson Dep. at 275:1–20., Dkt. No. 40.

---

**23.** UPS disputes that the disability benefit it paid Picinich was contractual, noting that Picinich himself admitted he was an at-will employee, and not bound by contract. *See supra,* at 508. It is notable that the Court of Appeals for the Second Circuit rejected a similar argument in the context of a breach of contract claim for denial of benefits, finding that defendant employer's contention that because plaintiff was an at-will employee, he could not state such a claim was without merit. *See Parker,* 204 F.3d at 339, *citing Leonelli v. Pennwalt Corp.,* 887 F.2d 1195, 1196 (2d Cir.1989). There the court found that "a company benefits plan may constitute a binding promise regardless of the employee's status." *Id.* In *Parker,* the court found that where, similar to here, an employee was entitled to disability leave based on his salary and length of service pursuant to the company benefits plan, his at-will status did not alter his entitlement to those benefits. *See Parker,* 204 F.3d at 339. Thus, because UPS admits its policy required that it pay Picinich twelve months of full salary as a disability benefit, it cannot argue that same should not be considered contractual in nature. However, such a finding has no bearing on the outcome here, since a benefit which is a contractual obligation may still be considered a reasonable accommodation pursuant to the ADA. *See Criado v. IBM Corp.,* 145 F.3d 437, 444 (1st Cir.1998).

■ This disagreement between the parties is irrelevant, however, since it is clear that leaves of absence, including those that are paid pursuant to company policy, may be considered a reasonable accommodation. *See Criado,* 145 F.3d at 444. However, this alone does not relieve UPS of liability under the ADA. An employer's duty to make reasonable accommodations is a continuing one, and will not be satisfied by a single effort. *See Parker,* 204 F.3d at 338. *See also McAlindin v. County of San Diego,* 192 F.3d 1226, 1237 (9th Cir.1999); *Cehrs v. Northeast Ohio Alzheimer's Research Ctr.,* 155 F.3d 775, 784 (6th Cir.1998); *Criado,* 145 F.3d at 445, (*quoting Ralph v. Lucent Techs., Inc.,* 135 F.3d 166, 171–172 (1st Cir.1998), *citing Bultemeyer v. Fort Wayne Community Sch.,* 100 F.3d 1281, 1285 (7th Cir.1996)). As there are material questions of fact outstanding regarding whether UPS refused to accommodate Picinich by reassigning him, or by facilitating his return to work in April 2000, the provision of disability benefits by itself will not be enough to award summary judgment to UPS on Picinich's failure to accommodate claim.

In summary, there are genuine issues of material fact regarding (1) whether UPS engaged in the interactive process with Picinich in April 2000 in order to facilitate his return to the Preload Manager position with accommodations, (2) whether UPS had a policy of reassigning management level employees between districts and therefore had a duty to assist Picinich in locating vacancies for positions outside the Upstate N.Y. District, and (3) whether UPS timely commenced and progressed through its 10–step ADA procedure after Picinich requested an accommodation and was released for work within restrictions by Dr. Kahn in January 2001. Therefore, because genuine issues of material fact remain as to the third and fourth elements of Picinich's claim of failure to provide a reasonable accommodation, defendants' motion for summary judgment as to that claim is denied.

## C. Count II: Discriminatory Discharge

The term, "discriminate" is also defined by the ADA as

> denying employment opportunities to ... a[n] employee who is an otherwise qualified individual with a disability, if such denial is based on the need of [the employer] to make reasonable accommodation to the physical or mental impairments of the employee.

42 U.S.C. § 12112(b)(5)(B). Pursuant to NYHRL,

> [i]t shall be an unlawful discriminatory practice for an employer ..., because of the ... disability ... of any individual, to refuse to hire or employ or to bar or to discharge from employment such individual or to discriminate against such individual in compensation or in terms, conditions or privileges of employment.

N.Y. Exec. L. § 296.1(a) (McKinney 2003).

■ The analysis of a claim for discriminatory discharge is the same under the ADA and NYHRL. *See Parker,* 204 F.3d at 332 n. 1. Picinich bears the burden of establishing his claim for discriminatory discharge, the elements of which mirror those of his first cause of action for failure to make a reasonable accommodation. *See id., citing Stone,* 118 F.3d at 96–97. Where a plaintiff establishes the first three elements of his failure to accommodate claim, such failure "amounts to discharge because of his disability." *Id., citing Ryan,* 135 F.3d at 870. Thus, if Picinich establishes the elements of his failure to accommodate claim, the burden shifts to UPS to establish undue hardship in order to defend against a claim of discriminatory discharge. *See id.*

Because there are genuine issues of material fact remaining regarding whether Picinich is a qualified individual with a disability, whether UPS refused to accommodate him, and whether the requested accommodations would impose an undue hardship upon UPS, such that defendants' motion for summary judgment as to Picinich's claim for failure to provide a reasonable accommodation is denied, defendants' motion for summary judgment as to Picinich's claim for discriminatory discharge is likewise denied.

### D. NYHRL Claims Against Individual Defendants

In the Complaint, Picinich sets forth a cause of action entitled, "Violation of New York Human Rights Law by individual defendants . . ." and alleges that "the individual defendants . . . have an ownership interest in [UPS], had and have the ability to hire, fire, and make other personnel decisions in regards to individuals employed by [UPS], and aided and abetted the [UPS] in failing and refusing to provide a reasonable accommodation of [Picinich's] disability as required under [NYHRL]." Compl. ¶ 40. During the hearing regarding these motions, Picinich voiced his intent to file two claims against the individual defendants: employment discrimination pursuant to NYHRL § 296.1(a) and aiding or abetting employment discrimination pursuant to NYHRL § 296.6. This court there held that under the liberal pleading standard of Fed. R.Civ.P. 8(a), the additional claim for aiding and abetting pursuant to § 296.6 would be allowed. *See Conley v. Gibson*, 355 U.S. 41, 47, 78 S.Ct. 99, 103, 2 L.Ed.2d 80 (1957). Upon further analysis of the NYHRL, the court now holds that the allegations in Count III set forth claims pursuant to §§ 296.1(a) (discriminatory discharge), 296.3 (failure to provide reasonable accommodation), and 296.6 (aiding and abetting violations of the NYHRL).

Picinich's allegations in the Complaint certainly comply with the requirement that he set forth "a short and plain statement of the claim that will give [UPS] fair notice of what [his] claim is and the grounds upon which it rests." *Conley*, 355 U.S. at 47, 78 S.Ct. 99. It is worth mentioning here that, although at the hearing regarding these motions, defendants' counsel contended that he was unprepared to discuss the aiding and abetting claim because § 296.6 was not cited by Picinich in his complaint, defendants' moving papers contained arguments against that very claim. Nonetheless, it is enough that Picinich's complaint put defendants on notice of the claims against them, and therefore, all three of the aforementioned NYHRL claims against the individual defendants will be discussed.

#### 1. *Discriminatory Discharge Pursuant to § 296.1(a) and Failure to Provide Reasonable Accommodation Pursuant to § 296.3*

A corporate supervisor or manager may be subject to personal liability under NYHRL § 296 only where said supervisor or manager has been deemed an employer within the meaning of the NYHRL. Therefore, as an initial matter, the court will address the issue of whether defendants Grover, Canavan and Wilson are "employers" within the meaning of NYHRL § 296. According to the New York Court of Appeals, a corporate manager or supervisor is not considered an employer pursuant to NYHRL unless he is shown to have (1) an ownership interest in the corporation *or* (2) any power to do more than carry out personnel decisions made by others. *See Patrowich v. Chemical Bank*, 63 N.Y.2d 541, 542, 483 N.Y.S.2d 659, 473 N.E.2d 11 (1984) (emphasis added).

The Court of Appeals set forth an "economic reality" test for determining

whether a defendant constitutes a plaintiff's employer pursuant § 296 under the second prong set forth in *Patrowich,* to wit, whether an individual supervisor or manager has the power to do more than carry out personnel decisions made by others. *See Heinemann v. Howe & Rusling,* 260 F.Supp.2d 592, 598 (W.D.N.Y.2003), *citing Patrowich,* 63 N.Y.2d at 544, 483 N.Y.S.2d 659, 473 N.E.2d 11. Under this test, the factors courts should consider are whether the individual supervisor or manager (1) had the power to hire or fire employees, (2) supervised and controlled employee work schedules or employment conditions, (3) determined the rate and methods of payment, and (4) maintained employment records. *See id.* However, no single factor of this test is dispositive, as "economic reality is based on all the circumstances." *Heinemann,* 260 F.Supp.2d at 598, *quoting Herman v. RSR Sec. Servs., Ltd.,* 172 F.3d 132, 139 (2d Cir.1999).

■ Defendants' sole argument against a finding that they are considered "employers" is that, although they own stock in UPS, not every stockholder of a corporation is an owner for purposes of NYHRL violations. *See Salomone v. Merrill Lynch,* 96–Civ.–6570, 1998 WL 151036, at *3 (S.D.N.Y. Mar.31, 1998). Picinich correctly notes that a lack of ownership interest alone is not dispositive under *Patrowich,* and defendants may still be considered employers where they do more than carry out personnel decisions. *See Patrowich,* 63 N.Y.2d at 542, 483 N.Y.S.2d 659, 473 N.E.2d 11. Nonetheless, Picinich points out that defendants *do* have an ownership interest in UPS, noting that in *Salomone,* the defendant was merely entitled to stock options, whereas here the individual defendants own actual stock in UPS. *See Salomone,* 1998 WL 151036, at *3.

Furthermore, Picinich argues that, even if defendants did not have an ownership interest, they did have the ability to do more than simply carry out personnel decisions at UPS. For example, as Human Resources Managers, Wilson and Grover had input into promotions, and control over the termination and transfer of employees as well as maintenance of records, *see* Pl.'s Ex. F, Wilson Dep. at 167:3–168:9; Pl.'s Ex. J, Fey Dep. at 228:10–17; Pl.'s Ex. G, Matt Dep. at 82:12–84:15; Pl.'s Ex. I, Canavan Dep. at 41:11–12, Dkt. No. 45, and as District Manager, Canavan had authority to promote and reassign employees, *see* Pl.'s Ex. G: Matt Dep. at 83:12–15; Pl.'s Ex. I: Canavan Dep. at 22:3–12; Pl.'s Ex. H: Grover Dep. at 149:6–10, Dkt. No. 45. Courts have held that an issue of material fact exists as to whether an individual supervisor or manager is an employer pursuant to § 296 where said individual, like Wilson and Grover, was charged with the hiring and firing of employees, *see Lapidus v. New York City Chapter of the New York State Association for Retarded Children, Inc.,* 118 A.D.2d 122, 131, 504 N.Y.S.2d 629 (N.Y.App.Div. 1986), or where, similar to defendant Canavan who had the authority to promote or reassign employees, the individual manager had the authority to set schedules and salaries, and to assign hours to employees, without consultation, *see Chamblee v. Harris & Harris, Inc.,* 154 F.Supp.2d 670, 677 (S.D.N.Y.2001).

Therefore, Picinich has established that an issue of fact exists as to whether the individual defendants are considered employers pursuant to NYHRL § 296. Nonetheless, defendants Grover, Canavan and Wilson will not be liable under § 296.1(a) or § 296.3 unless he proves all of the elements of his substantive discrimination claims, here, failure to accommodate and discriminatory discharge, respectively, and that the individual defendants actually participated in the discrimination. *See Bennett v. Progressive Corp.,* 225

F.Supp.2d 190, 214 (N.D.N.Y.2002), *citing Beattie v. Guilderland Cent. Sch. Dist.,* 124 F.Supp.2d 802, 805 (N.D.N.Y.2000), *(citing Tomka v. Seiler Corp.,* 66 F.3d 1295, 1317 (2d Cir.1995)).

To briefly review, pursuant to NYHRL, it is "an unlawful discriminatory practice" for an employer "to discharge from employment" or "to discriminate against [an] individual in compensation or in terms, conditions or privileges of employment" because of, among other things, disability, *see* § 296.1(a), or to "refuse to provide reasonable accommodations to the known disabilities of an employee," *see* § 296.3. The analysis of these NYHRL claims are identical to the analysis of claims pursuant to their counterparts in the ADA. *See Lovejoy–Wilson,* 263 F.3d at 212, n. 3; *Parker,* 204 F.3d at 332 n. 1.

Defendants argue that Picinich has not set forth any evidence that any one of them has participated in the alleged discrimination, or aided or abetted same. *See infra,* at 519. Defendants note that during Grover's tenure as Human Resources Manager for the Upstate N.Y. District, Picinich was considered totally disabled and Defendants Grover and Canavan provided him with disability leave and even attempted to have Picinich return to his position as Preload Manager with accommodations. Once defendant Wilson became the Human Resources Manager, defendants argue, he participated in the company's ADA procedure with Picinich and attempted to locate alternative positions for him within the District.

The foregoing arguments mirror those set forth by defendant UPS in support of its motion for summary judgment on the merits of the underlying ADA and NYHRL claims against it. Upon consideration of those arguments and the evidence of record, this court has already concluded that genuine issues of material fact remain regarding whether defendant UPS en-

gaged in the interactive process with Picinich in April 2000, and whether it timely commenced and progressed through its 10–step ADA procedure in January 2001. *See supra,* at 516. The participation of individual defendants Grover and Canavan in the alleged failure to provide reasonable accommodation in April 2000 is documented in the record, *see* Pl.'s Ex H, Grover Dep. at 147:5–14, 148:5–149:25, 155:9–21, 158:8–20, Dkt. No. 45; Pl.'s Ex. I, Canavan Dep. at 26:3–6, Dkt. No. 45, as is defendant Wilson's participation in the alleged failure to accommodate from January through May 2001, *see* Pl.'s Ex. F. Wilson Dep. at 103:8–104:4, 118:14–119:23, 122:6–18, 128:2–129:11, 136:5–22, 141:14–146:16, 150:7–172:11, Dkt. No. 45. Therefore, because genuine issues of material fact remain regarding whether the individual defendants (1) are employers within the meaning of NYHRL, and (2) participated in the alleged discrimination giving rise to violations of the NYHRL, defendants' motion for summary judgment as to Picinich's claims pursuant to §§ 296.1(a) and 296.3 is denied.

### 2. *Aiding or Abetting Employment Discrimination Pursuant to § 296.6*

Pursuant to NYHRL § 296.6, "[i]t shall be an unlawful discriminatory practice for any person to aid, abet, incite, compel or coerce the doing of the acts forbidden under [the NYHRL], or to attempt to do so." NY Exec. L. § 296.6 (McKinney 2003). In order for a plaintiff to recover against an aider or abettor of NYHRL violations pursuant to § 296.6, he must establish "(1) that [defendant] engaged in conduct protected by the NHYRL; (2) there is a causal connection between the protected conduct and the alleged [violations] of the NYHRL; and (3) that [defendant] 'actually participated' in the discrimination." *Beattie,* 124 F.Supp.2d at 805, *citing Tomka,* 66 F.3d at 1317.

■ Personal liability under this section of NYHRL is broader than that of, for example, § 296.1. *See Perks v. Town of Huntington,* 251 F.Supp.2d 1143, 1160 (E.D.N.Y.2003). Under § 296.6, an individual supervisor or manager may be held personally liable for aiding or abetting a violation of the NYHRL by their corporate employer if they participated in the conduct giving rise to a discrimination claim, even where said individual lacked the authority to hire or fire employees. *See Feingold v. New York,* 366 F.3d 138, 158 (2d Cir.2004), *citing Tomka,* 66 F.3d at 1317.[24] Here, the court has already held that genuine issues of material fact exist regarding whether the individual defendants participated in the alleged discrimination giving rise to violations of the NYHRL. *See supra,* at 518. Therefore, defendants' motion for summary judgment as to Picinich's claim pursuant to NYHRL § 296.6 is denied.

## IV. CONCLUSION

There are genuine issues of material fact remaining regarding the third and fourth elements of plaintiff's claim against defendant UPS for failure to provide a reasonable accommodation, to wit, whether plaintiff was a qualified individual with a disability within the meaning of the ADA, and whether UPS refused to accommodate plaintiff. There are also genuine issues of material fact remaining as to whether the requested accommodations would impose an undue hardship upon UPS. Also, the remaining claim against defendant UPS, to wit, discriminatory discharge, as well as the claims for NYHRL violations against individual defendants, Grover, Canavan and Wilson, necessarily depend on resolution of the questions of material fact re-

garding the failure to accommodate claim. Accordingly, defendants' motion for summary judgment against plaintiff on the entire complaint is hereby DENIED.

Plaintiff has established as a matter of law the first two elements of his failure to accommodate claim against defendant UPS, to wit, that he was disabled within the meaning of the ADA and that defendant UPS had notice of same. Therefore, Plaintiff's cross motion for partial summary judgment against defendant UPS regarding the first two elements of his failure to accommodate claim is hereby GRANTED.

IT IS SO ORDERED.

---

24. The court noted that although this aspect of *Tomka* has been criticized, "the majority of courts that have considered the issue have affirmed the existence of a cause of action

against individual defendants under the aid-or-abet provision of the NYSHRL." *Feingold v. New York,* 366 F.3d 138, 158 n. 19 (2d Cir.2004) (citations omitted).